UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| STEPHEN JONES, | | |
| | *Plaintiff,* | Case No: 22-cv-278-HE |
| v. | | |
| J. KEVIN STITT, Governor of Oklahoma and PAUL ZIRIAX, Secretary of the Oklahoma State Election Board, | | |
| | *Defendants.* | |

## RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................1

I. STATEMENT OF THE CASE ........................................................................1

   A. Response to Plaintiff's Undisputed Facts ...............................................1

   B. Defendants' Undisputed Facts ................................................................2

   C. Legal Foundations ..................................................................................3

   D. Procedural History .................................................................................4

II.     ARGUMENT .................................................................................5

   A. Plaintiff lacks a cause of action and standing to stop the election. .......5

     *1. The 17th Amendment does not unambiguously confer a right on Plaintiff.*................5

     *2. Plaintiff's attempts to manufacture standing should not be legitimized.* .......7

   B. The ongoing special election does not violate the Constitution. ...........11

     *1. Constitutional text and precedent permit the calling of a special election.* ...........11

     *2. The history of the Seventeenth Amendment and consistent practice confirm a special election can be called now.* ...........20

   C. Under Oklahoma law, the Governor validly called for the special election........23

   D. Under *Purcell*, this Court should not intervene in the 2022 election. ..................28

## TABLE OF AUTHORITIES

**Cases**

*Afran v. McGreevy,*
  115 Fed. Appx. 539 (3d Cir. 2004) .................................................................... 14

*Allen v. Powell,*
  244 N.E.2d 596 (Ill. 1969) ............................................................................... 13

*Biodiversity Legal Found. v. Babbitt,*
  146 F.3d 1249 (10th Cir. 1998) ........................................................................ 27

*Board of Education v. Nevels,*
  551 S.W.2d 15 (Ky. App. 1977) ....................................................................... 18

*Bryan v. Makosky,*
  846 A.2d 392 (Md. 2004) ................................................................................. 18

*Burton v. United States,*
  202 U.S. 344 (1906) ......................................................................................... 13

*Carney v. Adams,*
  141 S. Ct. 493 (2020) .................................................................................. 6, 8, 9

*Chiafalo v. Washington,*
  140 S. Ct. 2316 (2020) ..................................................................................... 26

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ........................................................................................... 8

*Clark v. Ritchie,*
  787 N.W.2d 142 (Minn. 2010) ......................................................................... 13

*De La Fuente v. Merrill,*
  214 F.Supp.3d 1241 (M.D. Ala. 2016) ............................................................. 27

*Diemer v. Carlson,*
  550 N.W.2d 875 (Minn. 1996) ................................................................... 17, 18

*Fish v. Schwab,*
  957 F.3d 1105 (10th Cir. 2020) .......................................................................... 8

*Gonzaga Univ. v. Doe,*
  536 U.S. 273 (2002) ........................................................................................... 5

*Good v. Roy,*
  459 F. Supp. 403 (D. Kan. 1978) ....................................................................... 5

*Gray v. Sanders,*
  372 U.S. 368 (1963) ........................................................................................... 7

*Griffith v. Choctaw Casino of Pocola,*
  2009 OK 51, 230 P.3d 488 ............................................................................... 23

*Hansen v. Highland,*
   147 N.E.2d 221 (Ind. 1958) ............................................................................18

*Hill v. Ibarra,*
   954 F.2d 1516 (10th Cir. 1992) ........................................................................5

*Husted v. Ohio State Conference of N.A.A.C.P.,*
   573 U.S. 988 (2014) .......................................................................................28

*In re Advisory Opinion to the Governor,*
   600 So. 2d 460 (Fla. 1992) .............................................................................13

*Jones v. Ziriax,*
   No. 120,253 (Okla. Supr. Ct.) ..........................................................................3

*Judge v. Quinn,*
   612 F.3d 537 (7th Cir. 2010) ......................................... 7, 11, 12, 14, 16, 17, 19, 21

*Libertarian Party v. Rednour,*
   108 F.3d 768 (7th Cir. 1997) ..........................................................................27

*Long Term Care Partners v. United States,*
   516 F3.d 225 (4th Cir. 2008) ............................................................................4

*Massachusetts v. EPA,*
   549 U.S. 497 (2007) .......................................................................................10

*Matter of Estate of Fulks,*
   2020 OK 94, 477 P.3d 1143 ...........................................................................23

*McKenzie v. Edwards,*
   361 So. 2d 880 (La. 1978) .........................................................................13, 17

*Merrill v. Milligan,*
   142 S. Ct. 879 (2022) ..........................................................................27, 28, 29

*Morrison v. Michael,*
   98 Cal.App.3d 507 (1979) ..............................................................................18

*Mullinax v. Garrison,*
   373 S.E.2d 471 (S.C. 1988) ...........................................................................18

*Murphy v. Pearson,*
   667 S.E.2d 83 (Ga. 2008) ..............................................................................18

*Murray Cty. v. Homesales, Inc.,*
   2014 OK 52, 330 P.3d 519 .............................................................................23

*NLRB v. Noel Canning,*
   573 U.S. 513 (2014) .......................................................................................20

*People v. Dethloff,*
   28 N.E.2d 850 (N.Y. 1940) ............................................................................18

*Phillips v. Rockefeller,*
    435 F.2d 976 (2d Cir. 1970)................................................................20

*Purcell v. Gonzalez,*
    549 U.S. 1 (2006) .................................................................... 27, 28

*RNC v. DNC,*
    140 S. Ct. 1205 (2020)...................................................................27

*Rodriguez v. Popular Democratic Party,*
    457 U.S. 1 (1982) .................................................................11, 12, 20

*Safe Streets All. v. Hickenlooper,*
    859 F.3d 865 (10th Cir. 2017) .........................................................10

*State ex rel. Johnson v. Albert,*
    40 P. 286 (Kan. 1895)....................................................................13

*State ex rel. Koch v. Lexcen,*
    308 P.2d 974 (Mont. 1957).............................................................18

*State ex rel. Oklahoma Tax Comm'n v. Mourer,*
    1979 OK 92, 596 P.2d 882..............................................................18

*Storer v. Brown,*
    415 U.S. 724 (1974) .......................................................................27

*Tappy v. State,*
    82 So.2d 161 (Fla. 1955) ................................................................18

*Tedards v. Ducey,*
    398 F. Supp. 3d 529 (D. Ariz. 2019) ............................ 7, 10, 13, 17, 18

*Tedards v. Ducey,*
    951 F.3d 1041 (9th Cir. 2020) ..............................................5, 7, 21

*Terry v. Cornett,*
    124 S.W. 870 (Ky. App. 1910) .......................................................18

*Trinsey v. Com. Of Pa.,*
    941 F.2d 224 (3d Cir. 1991)...........................................11, 17, 18, 27

*Trotti v. Detzner,*
    147 So.3d 641 (Fla. Dist. Ct. App. 2014)...........................................13

*United States v. Classic,*
    313 U.S. 299 (1941) .......................................................................11

*Valenti v. Rockafeller,*
    393 U.S. 405 (1969) .........................................................................7

*Valenti v. Rockefeller,*
    292 F. Supp. 851 (W.D.N.Y. 1968) .......................7, 11, 17, 18, 19, 20, 21

*Veasey v. Abbott*,
  830 F.3d 216 (5th Cir. 2016) ..................................................................28

*Wade v. EMCASCO Ins.*,
  483 F.3d 657 (10th Cir. 2007) ................................................................23

*Wash. State Grange v. Wash. State Republican Party*,
  552 U.S. 442 (2008) ...............................................................................11

*Wyler v. Sec'y of Com.*,
  802 N.E.2d 1042 (Mass. 2004)................................................................18

**Statutes**

U.S. Const. art. I, § 2, cl. 4....................................................................21

U.S. Const. art. I, § 4............................................................................21

U.S. Const. art. I, § 5, cl. 1....................................................................26

42 U.S.C. § 1983 .................................................................................5

Okla. Const. art. I, § 3, cl. 2..................................................................13

26 Okla. Stat. tit. 12 § 101 .....................................................3, 14, 22, 24

26 Okla. Stat. tit. 12 § 119......................................................3, 14, 22


**Other Authorities**

Chris Casteel, *Sen. Jim Inhofe, 87, to step down after replacement elected*,
  The Oklahoman (Feb. 24, 2022) ............................................................24

Congressional Research Service, *Authority of the Senate Over Seating Its Own Members*,
  April 16, 2009 ......................................................................................26

Paula Burkes, *Renowned civil rights attorney has no plans to stop practicing law*,
  The Oklahoman (Nov. 18, 2018)..............................................................2

Ray Carter, *House Approves Appointment Process for U.S. Senate Vacancies*,
  OCPA (May 27, 2021) ..........................................................................24

Reese Gorman Tweet, *The Frontier*,
  (March 24, 2022) .................................................................................24

Tres Savage, *Why U.S. Sen. Jim Inhofe announced retirement before March 1*,
  NonDoc (Feb. 24, 2022).........................................................................24

## INTRODUCTION

In late February 2022, longtime U.S. Senator Jim Inhofe sent Oklahoma Governor Kevin Stitt his "irrevocable pledge to retire" on January 3, 2023. Doc. 1-1. The next day, Governor Stitt ordered a special election "to fill a vacancy in the office," with the election dates to coincide with the regular 2022 election schedule. Doc. 1-2. Months have passed, and that schedule has already begun. Hundreds of candidates have filed for state offices (including 16 for Senator Inhofe's seat), the order of names on the ballots has been set, and hearings took place the same day as this brief's filing for contesting the candidacy of individuals. Millions of dollars have also been fundraised and spent to run for Senator Inhofe's seat.

Oklahoma's current U.S. Senators were both elected this way: with an irrevocable resignation letter followed by a special election that same year, while the Senator resigning was still in office. Nevertheless, Plaintiff claims that the U.S. Constitution's Seventeenth Amendment gives him the right to stop the special election, so that he *might* be temporarily appointed to the Senate by the Governor—the official he is currently suing. Plaintiff's claim must fail because (1) he lacks a cause of action and standing; (2) his arguments contravene constitutional text, precedent, history, and longstanding practice; (3) Oklahoma law provides for the calling of a special election in the circumstances here; and (4) halting the ongoing election procedures would be unprecedented and potentially upend all Oklahoma elections.

## I.   STATEMENT OF THE CASE

### A.   Response to Plaintiff's Undisputed Facts

1-5.  Defendants admit ¶¶ 1-5 of Plaintiff's Undisputed Facts.

6.   Defendants admit ¶ 6 except for the statement that Senator Inhofe's office is "currently scheduled to be <u>vacated</u> by Senator Inhofe effective on January 3, 2023." This characterization is a legal conclusion that is incorrect because, as explained below, a vacancy has happened through Senator Inhofe's irrevocable resignation sufficient to trigger a special election.

7-8. Defendants admit ¶¶ 7-8 of Plaintiff's Undisputed Facts.

9.   Defendants contest the use of the term "vacates" in ¶ 9 for the same reason as in ¶ 6. Moreover, there is no "formal" application process for a seat that Governor Stitt will not fill.

### B.   Defendants' Undisputed Facts

1.   In June 1994, U.S. Senator David Boren announced he would resign following the 1994 election cycle. *See* Ex. 1, Boren Letters (June 22, 1994).

2.   Oklahoma Governor David Walters set the special election to replace Senator Boren for the fall of that year, while Boren was still in office. *See* Ex. 2, Exec. Procl. (June 22, 1994).

3.   In January 2014, U.S. Senator Tom Coburn submitted his irrevocable resignation to Governor Mary Fallin, to be effective on January 3, 2015. Ex. 3, Coburn Letter (Jan. 17, 2014).

4.   Governor Fallin ordered a special election to be held in the fall of 2014, while Senator Coburn was still in office. Ex. 4, Exec. Procl. (Jan. 28, 2014).

5.   In 2018, Plaintiff admitted his "political career ended and law career started" decades ago, and he emphasized that "I have no plans to quit practicing law." Ex. 5, Paula Burkes, *Renowned civil rights attorney has no plans to stop practicing law*, THE OKLAHOMAN (Nov. 18, 2018).

6.   The 2022 Oklahoma election cycle has begun. Ex. 6, Paul Ziriax Aff. ¶ 3. Over 550 candidates have filed declarations of candidacy, including 16 individuals for the unexpired term

of retiring Senator Jim Inhofe. *Id.* ¶ 4. The order of names on absentee and primary ballots has been determined, and contested candidacy hearings have occurred. *Id.* ¶¶ 5-7.

7. On April 26, 2022, election officials will begin designing, proofing, and testing the ballots; and transmitting them to the printers. This will be done within one week. *Id.* ¶ 10.

8. It "is probably not possible to reprint ballots for the June 28, 2022, primary election due to paper supply chain issues." *Id.* ¶ 13.

9. On March 30, 2022, Plaintiff donated $2,000 to T.W. Shannon for Shannon's effort to win the special election. Ex. 7, Federal Election Commission (FEC) materials, at 7-C p. 1.

10. According to the Federal Election Commission (FEC), candidates for this special election have already raised over $4.3 million and spent over $1.1 million. *Id.* at 1.

## C. Legal Foundations

The Seventeenth Amendment provides for each State to have two U.S. Senators "elected by the people thereof." And Article 1, Section 4 of the Constitution states that the "Times, Places, and Manner of holding Elections for Senators … shall be prescribed in each State by the Legislature thereof." For nearly 50 years, Oklahoma law has provided that when a vacancy occurs in Oklahoma's representation in the U.S. Senate, the vacancy is generally filled in a special election called by the Governor. *See* 26 OKLA. STAT. tit. 12 § 101. And, for decades now, Oklahoma law has provided that an elected official may submit a resignation that "will not become effective immediately, but rather will become effective on some date certain." 26 OKLA. STAT. tit. 12 § 119 (enacted by Okla. Sess. Laws 2002, ch. 380, § 2); *see also* Okla. Sess. Laws 1994, ch. 260, § 27. Like any other vacancy, "[u]pon receipt of the irrevocable

3

letter of resignation, the Governor shall set the date for the special election." 26 OKLA. STAT. tit. 12 § 119.

Enacted last year, Senate Bill 959 modified the timing aspects of filling U.S. Senate seats, but it did *not* alter the triggering events for a special election. Ex. 8, S.B. 959. S.B. 959 merely clarified the timing of a special election, and it confirmed the existing law that the special election is triggered "[i]f a vacancy or irrevocable resignation occurs in the office of a member of the United States Senate." *Id.* § 1.

### D.   Procedural History

On March 7, 2022, Plaintiff sued Defendant Paul Ziriax in the Oklahoma Supreme Court, seeking—under that court's original jurisdiction—to halt the special election to replace Senator Inhofe. *See Jones v. Ziriax*, No. 120,253 (Okla. Supr. Ct.). Defendant Ziriax argued that original jurisdiction was not appropriate because Plaintiff lacked a cause of action and standing. *Id.*, Response Br., March 18, 2022. On the merits, he argued that a special election in advance of Senator Inhofe leaving office was permissible under federal law and the Constitution and required under state law. *Id.* At oral argument, several justices questioned their jurisdiction based on Defendant's arguments on standing and cause of action. *See, e.g.,* Ex. 9, Arg. Transcript at 10-12, 22 (Justice Kuehn questioning standing); *id.* at 18-19 (Justice Kane questioning cause of action); *see also id.* at 6, 25 (Justice Rowe questioning whether suit should have been filed in federal court). The day after argument, on March 24, 2022, the Oklahoma Supreme Court unanimously denied original jurisdiction. Doc. 3-8.

Afterward, Plaintiff indicated he would likely re-file his case in federal court. Ex. 10, Tweet by Reece Gorman, *The Frontier*. He did not immediately do so, however. Instead, a week

later he wrote Governor Stitt to "formally apply" for Senator Inhofe's seat. Doc. 3-7. In that letter, he lectured the Governor on state and federal law, and he admitted "I have recently stayed away from elective politics." *Id.* The next day, on April 1, 2022, he filed the present suit and motion seeking to "redress the ongoing violation of the Seventeenth Amendment"— without seeking any expedited interim relief. Doc. 1 at ¶ 1. Specifically, he asks this Court to issue a "permanent injunction against Defendants preventing the premature and unauthorized special election," as well as a mandate that Governor Stitt "issue a writ for a special election after Senator Inhofe vacates his office on or about January 3, 2023" and that he "temporarily appoint a replacement U.S. Senator until Senator Inhofe's office is filled." Doc. 3 at 23.

## II.   ARGUMENT

This Court should deny summary judgment to Plaintiff for at least four reasons: (1) Plaintiff lacks a cause of action and standing; (2) the Constitution allows a special election in these circumstances; (3) state law requires a special election in these circumstances; and (4) it is too late under the U.S. Supreme Court's *Purcell* principle to halt the election at this juncture.

### A.   Plaintiff lacks a cause of action and standing to stop the election.

Any plaintiff bringing a lawsuit in federal court must have a cause of action and standing, the two concepts involving somewhat separate inquiries. *See Long Term Care Partners v. United States*, 516 F.3d 225, 241 (4th Cir. 2008) ("whether a litigant has a sufficient personal stake in a suit is a different question than whether that litigant has stated a cause of action").

#### 1.   *The 17th Amendment does not unambiguously confer a right on Plaintiff.*

Plaintiff's claim is based almost entirely upon an alleged violation of the Seventeenth Amendment. *See* Doc. 1 at ¶¶ 1, 10. Unlike in state court, Plaintiff here cites 42 U.S.C. § 1983,

presumably as his cause of action. Doc. 1 at ¶ 1. By itself Section 1983 "does not protect anyone against anything," however; it merely creates a remedy for "the deprivation of any rights, privileges, or immunities secured by the Constitution." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283-85 (2002) (citation omitted)). Moreover, to maintain a cause of action, Plaintiff must do more than just name-check a constitutional amendment in conjunction with Section 1983. *See, e.g., Hill v. Ibarra*, 954 F.2d 1516, 1525 (10th Cir. 1992) (plaintiff alleging Fifth and Fourteenth Amendment violations nevertheless "stated no cause of action cognizable under § 1983"). Nor is it enough to show mere non-compliance with the Seventeenth Amendment. *See Gonzaga*, 536 U.S. at 283 ("it is only violations of *rights*, not *laws*, which give rise to § 1983 actions" (citation omitted) (emphases in original)). Instead, under Section 1983 Plaintiff must show that he has an "***unambiguously*** conferred right" found in the Seventeenth Amendment, rather than just "broader or vaguer 'benefits' or 'interests.'" *Id.* (emphasis added).

Nothing in the Seventeenth Amendment indicates that Plaintiff has been given a right—much less an unambiguous one—to sue or to obtain a temporary Senate appointment. To the contrary, the Seventeenth Amendment's "primary historical purpose" was "giving the people a greater voice in their own government" by having Senators chosen by popular vote. *Tedards v. Ducey*, 951 F.3d 1041, 1056 (9th Cir. 2020). Thus, he does not have a cause of action. *Cf. Good v. Roy*, 459 F. Supp. 403, 405 (D. Kan. 1978) ("The Seventeenth Amendment merely provides for the election of Senators by popular vote. To infer that it implies judicial redress to prevent misrepresentations by candidates is clearly unwarranted.").

To be sure, Plaintiff also claims that his right to vote is being violated. Doc. 3 at 20. But this is manifestly absurd, given that he is asking this Court to prevent hundreds of

thousands of Oklahomans from voting for (or against) their next Senator for two years so that he can instead obtain a temporary appointment. To the extent the Seventeenth Amendment does provide a right to vote, that right would be impeded and delayed by Plaintiff's suit, not advanced. At a minimum, it isn't unambiguous or clear that a person would have a right under the Seventeenth Amendment to *stop* a vote of the people for Senator from happening. And Plaintiff cites nothing for this proposition. In any event, Plaintiff's "right to vote" argument must be viewed in light of a concession he made at the Oklahoma Supreme Court:

> JUSTICE KUEHN: But, Mr. Jones, isn't the real issue here that you want to possibly be a senator in the United States Senate by appointment by a governor?
>
> MR. JONES: I don't challenge that.

Ex. 9, Arg. Tr. at 11. Plaintiff's "right to vote" argument is as pretextual as it is meritless. He does not have a cause of action under Section 1983.[1]

### 2.     *Plaintiff's attempts to manufacture standing should not be legitimized.*

To have standing, a plaintiff must "prove that he has suffered a concrete and particularized injury that is fairly traceable to the challenged conduct, and is likely to be redressed by a favorable judicial decision." *Carney v. Adams*, 141 S. Ct. 493, 498 (2020). The injury cannot be "conjectural or hypothetical." *Id.* at 498 (internal marks omitted). A "grievance that amounts to nothing more than an abstract and generalized harm to a citizen's interest in the proper application of the law does not count as an 'injury in fact.'" *Id.*

In Seventeenth Amendment cases, courts have only found standing when the plaintiffs

---

[1] Plaintiff also says he is bringing this suit pursuant to 28 U.S.C. §§ 2201 and 2202, Doc. 1 at 1, but those are merely the statutes outlining the process for obtaining a declaratory judgment.

were challenging the failure to call or delay in calling an election, and thus claiming (plausibly) that their right to vote was being negatively affected by a temporary appointment. *See, e.g. Valenti v. Rockefeller*, 292 F. Supp. 851, 853 n.1 (W.D.N.Y. 1968), *aff'd*, 393 U.S. 405 (1969); *Judge v. Quinn*, 612 F.3d 537, 544 (7th Cir. 2010); *Gray v. Sanders*, 372 U.S. 368, 375 (1963). As discussed above, the opposite is occurring here. Rather than seeking to vindicate or accelerate his right to vote for a U.S. Senator, Plaintiff is demanding a substantial *postponement* of the election, which would negatively affect his own right to vote as well as the right of all Oklahomans. It would also increase the time Oklahomans would not have a directly elected Senator representing them. Thus, Plaintiff cannot possibly rely on any right to vote for standing purposes. *Cf. Tedards v. Ducey*, 398 F. Supp. 3d 529, 540 (D. Ariz. 2019) ("The Statute does not deprive any Arizona citizen of their right to vote. In fact, the citizens of Arizona will get to exercise their right to vote two years earlier than they would have had the right to do otherwise."), *aff'd*, 951 F.3d 1041 (9th Cir. 2020).

As he admitted to the Oklahoma Supreme Court, Plaintiff's "real" claim for standing is that he is being denied the opportunity to be appointed, temporarily, as Senator. In state court, however, Plaintiff initially didn't even say he would *seek* the position; he merely mentioned he was "eligible" and "willing" to take an oath not to run in the later election. Br. in Sup., March 7, 2022, *Ziriax*, No. 120,253 (Okla. Supr. Ct.). Having failed with that, he has now transparently attempted to manufacture standing by submitting—literally the day before filing suit—a "formal" application to Governor Stitt requesting an appointment. This gamesmanship is insufficient to create standing. *Cf. Fish v. Schwab*, 957 F.3d 1105, 1120 (10th Cir. 2020) ("[R]espondents cannot manufacture standing merely by inflicting harm on

themselves ….." (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013)).

Plaintiff presumably attempted this last-second gambit because (as Defendant Ziriax pointed out in state court) the U.S. Supreme Court recently held that for standing a plaintiff challenging Delaware's method of selecting judges "must at least show that he is likely to apply to become a judge in the reasonably foreseeable future." *Carney*, 141 S. Ct. at 499-500. But importantly, *Carney* held that Adams was not actually "able and ready" to apply even though he testified under oath that he would apply to future judicial positions. There was no actual standing, the Court held, because the plaintiff had not applied for 14 open judgeships in the recent past, and the record contained "no evidence of conversations or other actions" in support of standing. *Id.* at 500-01. Adams's testimony that he would apply "stand[s] alone without any actual past injury, without reference to an anticipated timeframe, without prior judgeship applications, without prior relevant conversations, without efforts to determine likely openings, without other preparations or investigations, and without any other supporting evidence." *Id.* at 501. This context, the Court held, "suggests an abstract, generalized grievance, not an actual desire to become a judge." *Id.* Thus, based on "the longstanding legal doctrine preventing this Court from providing advisory opinions," the Court found no standing. *Id.*

In short, *Carney* made clear that there must be objective evidence of standing *beyond* just litigation posturing. Going further, the Court indicated that evidence of attempts to manufacture standing cut *against* standing. Indeed, the Supreme Court observed that "Adams became a political independent" just eight days before he filed his lawsuit claiming standing as an independent, and it held that this suspect timing was one piece of "evidence showing that, at the time he brought this lawsuit, Adams was *not* 'able and ready' to apply." *Id.* at 500

(emphasis added). If eight days is enough to cut against a plaintiff, then surely a letter sent a single day before a lawsuit is filed—and a week after a previous lawsuit on the same subject was rejected—is even more compelling to show a plaintiff's lack of standing.

To support this standing, Plaintiff mentions his failed run for U.S. Senate in 1990, as well as other items from his legal career. But all this shows is that he has declined, for over 30 years, to seek to become a Senator, including the past two occasions when an Oklahoma Senator has resigned mid-term. Furthermore, in a 2018 interview with *The Oklahoman*, he admitted that his "political career ended and law career started" decades ago, and he emphasized that "I have no plans to quit practicing law." Defs' Undisputed Fact No. 5. And just two days before he filed this suit, Plaintiff donated $2,000 to one of the candidates actually running to replace Senator Inhofe. Defs' Undisputed Fact No. 9. The next day, Plaintiff openly *admitted* in his supposed formal application letter that "I have recently stayed away from elective politics." Doc. 3-7. Here, like *Carney*, the evidence that is available does not show any legitimate standing. "Lawyers, such as [Plaintiff], may feel sincerely and strongly" that Defendants are not complying with the U.S. Constitution, "[b]ut that kind of interest does not create standing." *Carney*, 141 S. Ct. at 499.

Importantly, Plaintiff also fails the redressability prong of standing because he cannot show—beyond pure speculation—that he would receive an appointment or be a serious candidate for the position. As one court held in a Seventeenth Amendment case, the alleged harm of Plaintiff not being appointed "is speculative at best," since there is no indication the Governor would appoint him or that Plaintiff's chances of being a Senator "would be any different" if our next Senator is appointed rather than elected. *Tedards*, 398 F. Supp. 3d at 546.

"Even if there was harm here, there is not redressability, as the Court cannot Order the Governor to appoint [Plaintiff] to the vacant Senate seat, nor can the Court require the Governor to consider [Plaintiff] or any other individual." *Id.* at 546 n.17. Plaintiff's "formal" letter does not affect his lack of redressability, either as nothing in that letter in any way requires the Governor to appoint him or consider him at all—it's a shot in the dark.

In sum, Plaintiff has not shown a "concrete and particularized" injury, much less one that is "likely" to be redressed by a favorable ruling. Plaintiff is simply seeking an advisory opinion on a political question. Thus, he lacks standing and this case should be dismissed. *See Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 904 (10th Cir. 2017) ("Article III courts 'will not ... 'entertain citizen suits to vindicate the public's nonconcrete interest in the proper administration of the laws.'" (quoting *Massachusetts v. EPA*, 549 U.S. 497 (2007)).

**B.     The ongoing special election does not violate the Constitution.**

On the merits, Plaintiff is "asking this Court to interpret the Seventeenth Amendment as never done before in its 100-year history." *Tedards*, 398 F. Supp. 3d at 544. But Plaintiff's arguments are contradicted by the text of the Constitution, precedent, and historical practice.

*1.     Constitutional text and precedent permit the calling of a special election.*

To determine the Legislature's power to require the calling of a special election upon Senator Inhofe's submission of an irrevocable resignation, but before the effectiveness of the resignation, we must begin with the text of our Constitution. To start, the Oklahoma Legislature has the explicit authority to determine when elections should occur. This stems from Article I, § 4 of the U.S. Constitution, as well as Article III, § 4 of the Oklahoma Constitution: "[t]he **Times**, Places and Manner **of holding Elections for Senators** and

Representatives, shall be prescribed in each State **by the Legislature** thereof," unless otherwise provided by Congress. (emphases added). Thus, "[t]he States possess a broad power" to determine election times and manner, *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451 (2008), and "wide discretion in the formulation of a system" of electing people to Congress, *United States v. Classic*, 313 U.S. 299, 311 (1941). Incredibly, in the midst of arguing that the "Seventeenth Amendment provides the exclusive authority for filling a vacated U.S. Senate seat," Doc. 3 at 10, Plaintiff never once mentions Article I, § 4 of the U.S. Constitution. Plaintiff is just flat-out wrong on this point. *See Quinn*, 612 F.3d at 550, 552-53.

The Oklahoma Legislature's immense discretion is only confirmed by the Seventeenth Amendment. It provides that "**the legislature** of any state may empower the executive thereof to make temporary appointments until the people fill the vacancies by election **as the legislature may direct**." (emphases added). As the Third Circuit has observed, "the explicit provision in the vacancy paragraph of the Seventeenth Amendment vesting discretion in the state legislatures not once, but twice, cannot have been without significance." *Trinsey v. Com. Of Pa.*, 941 F.2d 224, 234 (3d Cir. 1991). And as another court stated—in a decision summarily affirmed and later endorsed by the U.S. Supreme Court—"[t]he Seventeenth amendment's vacancy provision explicitly confers upon the state legislatures discretion concerning the time of vacancy elections." *Valenti*, 292 F. Supp. at 855-56; *see also Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 10 (1982) (endorsing *Valenti*); *Quinn*, 612 F.3d at 554 (7th Cir. 2010) ("State law controls the timing and other procedural aspects of vacancy elections.").

The primary text of the Seventeenth Amendment also confirms the propriety of Oklahoma setting up a process whereby a resignation can trigger a special election that will fill

the seat immediately after the resignation is effective. It states: "The Senate of the United States shall be composed of two Senators from each State, elected by the people thereof…." Thus, the text demands: (1) Two Senators from each State; (2) that are elected by the people. Oklahoma's process ensures those two textual requirements are fulfilled with no gap. Plaintiff's claim, meanwhile, will mean that there will be a lengthy period when Oklahoma will lack two Senators and/or one of the Senators will *not* be elected by the people. Plaintiff's view thus undermines the plain text of the Seventeenth Amendment.

To justify his view, Plaintiff relies on the principal clause of the Seventeenth Amendment's vacancy provision: "When vacancies happen in the representation of any State in the Senate, the executive authority of such State shall issue writs of election to fill such vacancies …." He claims that because a "vacancy" has not yet occurred in the seat to which Senator Inhofe was elected, the Seventeenth Amendment forbids the State from holding an election. There are at least two significant defects with this view.

*First*, Plaintiff is incorrect in his claim that, under the supposed plain meaning of "vacancy," a vacancy has not yet happened by submission of irrevocable resignation. The term vacancy as interpreted in a variety of different contexts shows that its plain meaning includes the situation at bar. As the Kansas Supreme Court held during the years the Seventeenth Amendment was being debated, "vacancies caused by resignation are usually made and accepted in advance of the time the resignation is to take effect." *State ex rel. Johnson v. Albert*, 40 P. 286, 287 (Kan. 1895). More recently, the Florida Supreme Court held: "When a letter of resignation to be effective at a later date is received and accepted by [the Governor], a vacancy in that office occurs and actuates the process to fill it." *In re Advisory Opinion to the Governor*, 600

So. 2d 460, 462 (Fla. 1992). Similarly, the Illinois Supreme Court has held that a "resignation with finality created a vacancy within the meaning of the constitution and that the Governor properly issued the writs of election forthwith to the end that the vacancy be promptly filled." *Allen v. Powell*, 244 N.E.2d 596, 597-98 (Ill. 1969); *see also McKenzie v. Edwards*, 361 So. 2d 880, 881-82 (La. 1978); *Trotti v. Detzner*, 147 So.3d 641, 644 (Fla. Dist. Ct. App. 2014).

Plaintiff cites various sources for his claim a vacancy has not yet occurred, but none are availing. Doc. 3 at 6-8. He relies on dictionary definitions and *Burton v. United States*, for instance, to claim that a vacancy can only occur through death, expiration of term, or forcible removal. But that is incorrect: resignation can obviously also create a vacancy. *See, e.g.*, *Tedards*, 398 F. Supp. at 535 ("If a vacancy occurs for any reason, such as a senator's death, **resignation**, or expulsion," 17th Amendment vacancy clause applies (emphasis added)); *Clark v. Ritchie*, 787 N.W.2d 142, 147 (Minn. 2010) (rejecting a "restrictive definition of vacancy" that would exclude mid-term retirements and include only "death, disability, and involuntary removal from office"). Neither source Plaintiff cites says anything to the contrary; they only deal with *other* situations that can cause a vacancy, like forced removal. *See Burton v. United States*, 202 U.S. 344, 368-70 (1906).

Indeed, the original Senate vacancy clause in the Constitution in Art. I, § 3, cl. 2, provided for appointment "if Vacancies happen by Resignation, or otherwise," and nothing in the Seventeenth Amendment evinces an intent to exclude resignations from creating a vacancy. *See Tedards*, 951 F.3d at 1052 (17th Amendment "retains much of" original vacancy clause). Plaintiff also relies on *Quinn*, but there the Seventh Circuit did not define when a vacancy "happens," and instead held a Governor was legally mandated to call a special election

to fill a Senate vacancy after he had refused to do so. *Quinn*, 612 F.3d 537.  Plaintiff here seeks

the opposite of what *Quinn* said is mandatory.

Plaintiff also relies on the district court's decision in *Afran v. McGreevy*, but on appeal,

the Third Circuit only affirmed the district court's decision because the New Jersey Governor

had merely announced his resignation verbally at a press conference, whereas New Jersey law

required an official written resignation to be filed with the Secretary of State to trigger

"vacancy" status. 115 Fed. Appx. 539, 547-48 (3d Cir. 2004).[2] By contrast, Sen. Inhofe has

fully complied with Oklahoma law by his letter of irrevocable resignation. *See* 26 OKLA. STAT.

tit. 12 §§ 101(C)(4), 119. *McGreevy*, in short, supports Defendants, not Plaintiff. Plaintiff

cherry-picks a single quote from the Third Circuit opinion stating that, "There is no vacancy

here because the Governor has not yet resigned and because he continues to serve and occupy

the office." Doc. 3 at 8 (quoting *McGreevey*, 115 Fed. Appx. at 540).  But this just ignores the

rest of the Third Circuit opinion, which explains in detail that the New Jersey Governor's in-

advance resignation was insufficient to create a vacancy only because it didn't follow New

Jersey law: "Under New Jersey law, a resignation is not valid unless it is in writing and filed in

the office of the Secretary of State." *McGreevey*, 115 Fed. Appx. at 548. And saying that the

Third Circuit's decision "did not alter" the district court's decision, Doc. 3 at 8 n.3, is

unpersuasive when the Third Circuit opinion undeniably departed from the district court

reasoning that Plaintiff relies upon.

---

[2] Moreover, the district court in *Afran* acknowledged that many decisions disagree with its definition of vacancy, *see id.* at 410, and the court was loathe to interfere with the decision of state officials *not* to call a special election. 336 F. Supp. 2d 404, 410-411 (D.N.J. 2004). Here, Petitioner seeks to *interfere* with the State's decision to call an election.

In the end, reading "When vacancies happen" in the Seventeenth Amendment to mean that States cannot act upon a vacancy until the moment the office is physically empty doesn't comport with how English is spoken and understood.  To give just one example, suppose a groundskeeper was told that, "When baseball season starts, please prepare the field for play." The groundskeeper would be well within his right to work on getting the field prepared *in advance* of the start of the season. He would not have to wait until the first pitch is thrown to begin watering the field, mowing the grass, or chalking the foul lines. Moreover, before the Oklahoma Supreme Court, Plaintiff conceded that a letter of resignation could be considered to create a vacancy in advance of the resigning person leaving office if it is within a "reasonable" time such as a "few days." Ex. 9, Arg. Tr. at 15; *see also id.* at 28. A "reasonable judgment" must be made in that circumstance, Plaintiff admitted. *Id.* at 15. But to the extent that discretion may be exercised within reason, then as explained above the Constitution explicitly vests that discretion with the Legislature, not Plaintiff.

 Nevertheless, Plaintiff claims that Defendants' arguments somehow fail because even with the special election completed, there will still be a vacancy of at least 25 seconds on January 3, 2023, between when Senator Inhofe leaves and the new Senator is sworn in. Doc. 3 at 11 & n.8. This, Plaintiff's convoluted argument goes, will require the Governor under the Seventeenth Amendment to schedule a special election, which (in turn) will render the 2022 special election "ineffective." *Id.* Plaintiff cites nothing for the premise that the 25-second gap between one Senator leaving and another being sworn in can be considered a "vacancy" for purposes of the Seventeenth Amendment, however, which is not surprising given that such a reading would truly be fantastical. Indeed, it would prove far too much, as a vacancy would

be created every single time someone left office, even if their successor had been elected to replace them under the normal election cycle.

*Second*, even if Plaintiff is correct that a vacancy has not yet happened, nothing in the Seventeenth Amendment *prohibits* the State from exercising its constitutional power to conduct an election in anticipation of an impending vacancy. Again, Oklahoma has the inherent and broad power to determine the timing of Senate elections pursuant to Article I, § 4 of the U.S. Constitution, which is further confirmed by the Seventeenth Amendment's clause that "the people fill the vacancies by election as the legislature may direct." *See Quinn*, 612 F.3d at 550 (noting "that the power of state legislatures to regulate elections to fill vacancies in the Senate is not established by the second paragraph of the Seventeenth Amendment alone" but also by "the Elections Clause in Article I, Section 4"); *see also id.* at 552-53. Again, it is remarkable that Plaintiff entirely refuses to acknowledge the Legislature's power under Article I, Section 4.

The Seventeenth Amendment provides one situation in which exercise of that power is mandatory: "When vacancies happen in the representation of any State in the Senate, the executive authority of such State shall issue writs of election to fill such vacancies…." But the fact that the amendment imposes a *duty* to call elections in a particular circumstance does not mean that the State is *prohibited* from exercising that same power in other circumstances, such as calling an election to fill an impending vacancy. "The Seventeenth Amendment does not mandate that a special election take place within a certain time frame. Rather, it allows the election to be held 'as the legislature may direct.'" *Tedards*, 398 F. Supp. 3d at 540. And this Court should refuse "to read a limitation into the Seventeenth Amendment that is not there." *Quinn*, 612 F.3d at 550. Plaintiff's interpretation would impermissibly re-write the Seventeenth

Amendment to add the word "only" before "shall issue writs of election." Without a textual prohibition in the Seventeenth Amendment or elsewhere, the Legislature has plenary authority to time elections as it sees fit, including to fill an upcoming vacancy.

Indeed, if there is one consistent thread running through all Seventeenth Amendment precedent, it is that state legislatures retain their broad authority on the timing and manner of elections to fill vacancies. *See Quinn*, 612 F.3d at 552-53 (history shows "state legislatures were the central actors when it came to passing laws that governed the election of senators"); *Trinsey*, 941 F.2d at 230 (manner of Senate elections is "to be a purely local question"); *id.* at 233-35 (state discretion in filling vacancies subject only to "deferential" review); *Valenti*, 292 F. Supp. at 854-56 ("The Seventeenth Amendment's vacancy provision explicitly confers upon the state legislatures discretion concerning the timing of vacancy elections."); *Tedards*, 398 F. Supp. 3d at 540 ("the method chosen by the state legislature for filling vacancies is entitled to substantial deference"). The Legislature is free to exercise that discretion so long as it advances substantial state interests. *Valenti*, 292 F. Supp. at 861.

Here, it is well-recognized that the State has a substantial interest in ensuring there is a process whereby a resignation does not result in Oklahoma lacking full representation in the Senate chosen by the people, preserving the essential right guaranteed under the Seventeenth Amendment. *See Trinsey*, 941 F.2d at 233-34 (state procedure "serves the legitimate purpose of ensuring that vacancies are filled promptly"); *cf. McKenzie*, 361 So. 2d at 883; *Diemer v. Carlson*, 550 N.W.2d 875, 877-78 (Minn. 1996); *Terry v. Cornett*, 124 S.W. 870, 871 (Ky. App. 1910). That is, "it is apparent that [Oklahoma] seek[s] to *increase* rather than suppress the right to vote," since Oklahomans "will get to exercise their right to vote two years earlier than they

would have had the right to do otherwise," which is an unquestionably legitimate state interest. *Tedards*, 398 F. Supp. 3d at 539-40. And Oklahoma's process also serves the substantial interest of "minimiz[ing] the time in office of an unelected Senator," such that voters are "best accommodated by giving them an opportunity to express their preference as to representation in a special election as promptly as possible." *Trinsey*, 941 F.2d at 235. Oklahoma provides for an election soon after the submission of an irrevocable resignation, and "[i]t is not for [this] court to substitute its own judgment for that of the elected representatives of the people." *Valenti*, 292 F. Supp. at 867.

So while no case has ever addressed the precise issue at bar, court after court has upheld in other contexts the practice of starting or completing the process to fill a vacancy before the effective date of a tendered resignation.[3] The Oklahoma Supreme Court, for instance, has upheld the validity of "prospective appointments." *State ex rel. Oklahoma Tax Comm'n v. Mourer*, 1979 OK 92, ¶¶ 18-24, 596 P.2d 882, 887. The text of the Seventeenth Amendment provides no basis to believe that what is permitted in those other contexts is impermissible for Senate seats. In fact, essentially every general election—whether for Senate or otherwise—takes place *in anticipation of* an upcoming vacancy, usually because of the upcoming expiration of a term of office. That is why we hold general elections every November: to fill the *upcoming* vacancy

---

[3] *Murphy v. Pearson*, 667 S.E.2d 83, 85 (Ga. 2008) (citing *Bryan v. Makosky*, 846 A.2d 392, 397 (Md. 2004)); *Wyler v. Sec'y of Com.*, 802 N.E.2d 1042, 1045-46 (Mass. 2004); *Diemer*, 550 N.W.2d at 877-78; *Mullinax v. Garrison*, 373 S.E.2d 471, 472 (S.C. 1988) (citing *Morrison v. Michael*, 98 Cal.App.3d 507, 511-12 (1979) (citing *Tappy v. State*, 82 So.2d 161, 166 (Fla. 1955)); *Hansen v. Highland*, 147 N.E.2d 221, 225-26 (Ind. 1958); *Board of Education v. Nevels*, 551 S.W.2d 15 (Ky. App. 1977); *State ex rel. Koch v. Lexcen*, 308 P.2d 974 (Mont. 1957); *People v. Dethloff*, 28 N.E.2d 850 (N.Y. 1940)); *Terry*, 124 S.W. at 871.

scheduled to take place the following January. Accordingly, both constitutional text and copious precedent demonstrate Plaintiff has no right to halt the upcoming election.

> 2.    *The history of the Seventeenth Amendment and consistent practice confirm a special election can be called now.*

To the extent that there is any question on the propriety of the Legislature's choice to provide for calling an election upon an irrevocable resignation, both the history of the Seventeenth Amendment and longstanding practice make clear this practice is permissible.

The history of the Seventeenth Amendment demonstrates several reasons for its ratification relevant here. Most obviously, the "primary objective" of the Seventeenth Amendment is to "guarantee[] that senators are selected by the people of the states in popular elections." *Quinn*, 612 F.3d at 555; *see also Tedards*, 951 F.3d at 1056; *Valenti*, 292 F. Supp. at 864. Another historical justification was that, when Senators were chosen by the people's representatives rather than the people themselves, it tended to greater risk of corruption, bribery, and patronage. *See Tedards*, 951 F.3d at 1055-56. Finally, the historical evidence behind the vacancy clause in the Seventeenth Amendment shows that it was "to ensure that vacancies in the Senate were filled promptly." *Quinn*, 612 F.3d at 548.

Oklahoma's system for filling vacancies—the only way to immediately replace a resigning Senator with an elected (instead of appointed) successor—accords perfectly with this history of the Seventeenth Amendment. "Reading the Seventeenth Amendment Vacancy Clause in the context of its primary historical purpose, we think that the people are generally more empowered the more of a Senate term they are permitted to fill by election." *Tedards*, 951 F.3d at 1056. By contrast, requiring an appointment rather than election, as Plaintiff

demands, would increase the risk of bribery and corruption, such as when Illinois Gov. Blagojevich attempted to sell President Obama's vacant Senate seat. *Tedards*, 951 F.3d at 1057. And "the popular purpose of the Seventeenth Amendment counsels interpreting it to minimize the interval preceding the vacancy election and likewise the duration of appointed representation." *Id.* at 1056-57. Thus, Oklahoma's system enables vacancies to be filled quickly, recognizing that "the election of a replacement Senator is uniquely urgent in the sense that the Constitution prizes the equal representation of the States." *Tedards*, 951 F.3d at 1054 (citing U.S. Const. art. V). It would therefore be the height of irony if Plaintiff's theory is correct, because an Amendment meant to guarantee that each State has two Senators elected "by the people thereof" would *prevent* Oklahoma from ensuring that it has two popularly elected Senators. Oklahoma's system of ensuring a seamless transition between a resigning Senator and an elected successor is "no fundamental imperfection in the functioning of democracy," *Rodriguez*, 457 U.S. at 11 (quoting *Valenti*, 292 F. Supp. at 867), but instead is entirely consistent with the history of the Seventeenth Amendment.

Historical practice also resolves any ambiguity. As the U.S. Supreme Court stated when interpreting when "Vacancies … may happen" for purposes of Art. II, § 2, cl. 3, "[l]ong settled and established practice is a consideration of great weight in a proper interpretation of constitutional provisions." N*LRB v. Noel Canning*, 573 U.S. 513, 524 (2014) (citation omitted); *see also Phillips v. Rockefeller*, 435 F.2d 976, 980 (2d Cir. 1970) (applying similar analysis to 17th Amendment claim); *Valenti*, 292 F. Supp. at 858-59 (same). The consistent practice in Oklahoma has been to hold a special election in advance of the effectiveness of an irrevocable resignation. Undisputed Fact Nos. 1-4. *Both* our current Senators were elected in that manner.

21

In the U.S. House of Representatives—subject to a similar vacancy clause as the 17th Amendment, U.S. Const. art. I, § 2, cl. 4[4]—States commonly set special elections after a resignation is announced even before the resignation is effective.[5]

And the process to fill a judicial vacancy is commonly started, if not completed, in advance of the effectiveness of a tendered judicial resignation. Judge Ketanji Brown Jackson just underwent confirmation hearings to replace Justice Stephen Breyer, whose resignation letter said his decision would "take effect when the Court rises from the summer recess … assuming that by then my successor has been nominated and confirmed." Ex. 11, Breyer Resignation (Jan. 27, 2022). Under Plaintiff's theory of vacancy, the confirmation of Judge Jackson should be nullified because Justice Breyer hasn't actually left office yet. Plaintiff claims this is distinguishable because "Article III of the U.S. Constitution gives Congress broad authority over setting up the U.S. Supreme Court," Doc. 3 at 10 n.7, but that completely ignores (again) that the Elections Clause gives State Legislatures broad authority over setting the "Times, Places, and Manner of holding Elections for Senators," U.S. Const. Art. I, § 4. Thus, Plaintiff's view that the process of filling vacancies cannot begin until a resignation is effective threatens not just the current race, but judicial selections as well.

---

[4] *See Tedards*, 951 F.3d at 1054, 1057; *Quinn*, 612 F.3d at 547; *Valenti*, 292 F. Supp. at 862.

[5] In Maine, Rep. Stephen Coburn was elected in a special election in November 1860, even though his predecessor's resignation was not effective until January 1861. In Pennsylvania, Rep. John Thompson was election in November 1874, even though his predecessor's resignation was not effective until January 1875. In Massachusetts, Gov. Patrick announced a special election in May 2007 to occur later that year even though the resignation of Rep. Martin Meehan was not effective until July 1, 2007. In Ohio, Gov. DeWine called a special election in April 2021, even though Rep. Steve Stivers' resignation was not effective until May 16, 2021.

C.     **Under Oklahoma law, the Governor validly called for the special election.**

Consistent with the discretion provided to the State Legislature by the Constitution, Oklahoma statutes permit the calling of a special election this year to replace the outgoing Senator Inhofe. Under Oklahoma law, the Governor may call a special election for a U.S. Senate seat upon the Secretary of State's receipt of a letter of irrevocable resignation, just as he may do so with any other vacancy.

Contrary to Plaintiff's claim that the Oklahoma Legislature "first recognized the option of an 'irrevocable resignation' by a U.S. Senator" in 2021, Doc. 3 at 16, Oklahoma law has for decades provided that "[u]pon receipt of the irrevocable letter of resignation, the Governor shall set the date for the special election." 26 OKLA. STAT. tit. 12 § 119 (originally enacted in 2002). This statute twice makes clear that the election may be called *before* the resignation becomes effective. First, it defines an irrevocable resignation as a letter that says "the resignation will not become effective immediately, but rather will become effective on some date certain." *Id.* Second, it states that the "person elected at the special election shall take office on the later of the date of certification of the results of the special election or the date the resignation of the incumbent becomes effective ...." *Id.* The latter situation clearly envisions that the resigning incumbent will still be in office when the special election takes place.

The other relevant statutes reinforce this conclusion. As modified by S.B. 959, 26 OKLA. STAT. tit. 12 § 101(C) provides that "[i]f a vacancy *or irrevocable resignation* occurs in the office of a member of the United States Senate from Oklahoma, the vacancy shall be filled as provided in subsection C of Section 10 of Title 51 of the Oklahoma Statutes." (emphasis added). It then goes on to detail timing and further clarifies in paragraph (C)(4) that

23

the provisions relating to irrevocable resignations in Section 12-119 cited above are equally applicable to U.S. Senate seats. Meanwhile, Section 10(C) of Title 51—which is explicitly triggered by an irrevocable resignation in the just-cited portion of Section 12-101(C) of Title 26—calls for, within 30 days, *both* the gubernatorial appointment to temporarily fill any vacancy *and* calling a special election.

These repeated references to irrevocable resignation in these statutes would be a nullity if Plaintiff's interpretation of state law were correct. *See* Doc. 3 at 16-19. But this Court should not "make the language of all three statutes superfluous" because Oklahoma courts "never presume the Legislature has done a vain and useless thing." *Matter of Estate of Fulks*, 2020 OK 94, ¶ 21, 477 P.3d 1143, 1151; *cf. Wade v. EMCASCO Ins.*, 483 F.3d 657, 665–66 (10th Cir. 2007) ("federal court must attempt to predict what the state's highest court would do").

To the extent there is any ambiguity here, the intent of the Legislature is confirmed by historical practice and the widely agreed upon original public meaning of these laws. *See Griffith v. Choctaw Casino of Pocola*, 2009 OK 51, ¶ 25, 230 P.3d 488, 497 (if a phrase in a statute "is not commonly understood, the court will inquire into the contemporaneous understanding"); *Murray Cty. v. Homesales, Inc.*, 2014 OK 52, ¶ 11, 330 P.3d 519, 525 ("The construction placed on a statute by officers in the discharge of their duties ... which has been long acquiesced in, is a just medium for its judicial interpretation."). As detailed above, longstanding and consistent practice has implemented state law by the setting of a special election for U.S. Senate upon submission of a letter of irrevocable resignation effective at a future date, such as occurred with Senators Boren and Coburn. S.B. 959 did not change this basic framework; rather, its amendments to 26 OKLA. STAT. tit. 12 § 101 explicitly confirmed this process.

24

S.B. 959 provides additional ability for the Governor to fill vacancies, but everyone at the time agreed that additional power is not needed when an irrevocable resignation becomes effective only after a special election can be conducted. Thus, for example, opponents of S.B. 959 thought additional gubernatorial appointment power was unnecessary because Senator Coburn "announced in advance that he would resign effective Jan. 3, 2015, and his successor, U.S. Sen. James Lankford, R-Oklahoma City, was elected through a special election prior to that date and sworn in the same day Coburn vacated the seat." Ex. 12, Ray Carter, *House Approves Appointment Process for U.S. Senate Vacancies*, OCPA (May 27, 2021). Proponents responded that the bill was not meant to change the process in that scenario, but instead to provide a gap-filling mechanism when there was a period between the vacancy and a special election: "Everybody agrees that [Coburn's practice] is the best scenario, and I'm so thankful to the late Senator Coburn for setting that process up to set the state of Oklahoma up for success." *Id.* This debate was widely reported at the time, *see id.*, and when Senator Inhofe recently submitted his irrevocable resignation, it was widely understood by the public that Oklahoma law provided for a special election *this year*.[6] Moreover, the Oklahoma Legislature has now voiced its opinion favoring Defendants before the Oklahoma Supreme Court and this Court. Doc. 19. Thus, it appears Plaintiff is virtually alone in his interpretation of the relevant statutes, so this Court should resolve any ambiguity in favor of the original, consistent,

---

[6] Ex. 13, Chris Casteel, *Sen. Jim Inhofe, 87, to step down after replacement elected,* THE OKLAHOMAN (Feb. 24, 2022) (noting that under S.B. 959, "Inhofe had to announce his resignation by March 1 to trigger a special election that could be held at the same time as this year's general election"); Ex. 14, Tres Savage, *Why U.S. Sen. Jim Inhofe announced retirement before March 1*, NONDOC (Feb. 24, 2022).

and universal understanding of their meaning, which provides for a special election this year.

Left without any support in the text of the relevant statutes read together as a whole, and without any support from the universally understood meaning of these laws, Plaintiff resorts to conjuring outlandish hypotheticals, such as imagining that the 87-year-old Senator Inhofe reverses course on his resignation, Doc. 3 at 13-15 & n.9, or that a re-elected Senator Lankford submits his irrevocable resignation the day he starts his new term, *id.* at 18.

But Plaintiff is incorrect in stating Senator Inhofe's resignation is unenforceable; after all, even Plaintiff concedes the Senate has the power to remove him by a two-thirds vote if, after Oklahoma holds an election to replace him, he tries to renege. Doc. 3 at 12-14. Plaintiff attempts to get around this by arguing that the general "fragility of life" or a "theoretical future expulsion vote" cannot be enough to create a present vacancy. *Id.* at 14. This is a strawman. Defendants aren't arguing that a theoretical future expulsion (or death) create a present vacancy; rather, the point is that a proper irrevocable resignation letter creates the vacancy. The possible future vote is just a potential mechanism for enforcing the resignation. Similarly, Plaintiff argues that "the fact that a future vote of 67 Senators is required to remove Senator Inhofe proves that his February 28, 2022 retirement letter did not trigger a vacancy." *Id.* It proves no such thing. Again, there is no evidence that a "future vote" will in "fact" be necessary to remove Senator Inhofe; this is an unrealistic hypothetical Plaintiff has raised. The irrevocable resignation letter, on the other hand, proves that Senator Inhofe is going to resign willingly on a certain date in the near future, which creates the present vacancy.[7]

---

[7] Plaintiff claims that because Senator Inhofe can allegedly be seen in a TV ad saying he has "decided to retire from the Senate next November" that this means he "has now contradicted

Significantly, Plaintiff doesn't acknowledge the additional "authority of the Senate to 'exclude'" a Senator for "a failure to be duly elected or selected, such that one is not entitled to the seat," and that this action "may be determined by majority vote." Ex. 15, Congressional Research Service, *Authority of the Senate Over Seating Its Own Members*, April 16, 2009, at 8 (citing U.S. Const. Art. I, § 5, clause 1). Thus, even just a simple majority of the Senate could choose to seat the duly elected successor to Senator Inhofe rather than Senator Inhofe. In any event, Plaintiff's argument collapses on itself. Plaintiff claims that the Senate is the "sole judge" of its membership, Doc. 3 at 13, but then urges this Court to enjoin the special election and remove the possibility that the Senate could or would make such a choice. Despite Plaintiff's rhetoric, Plaintiff wants the courts to decide *instead of* the Senate.

Moreover, Oklahoma could potentially enforce the irrevocable resignation. In 2020, for example, the U.S. Supreme Court decided in *Chiafalo v. Washington* that States may punish or replace "faithless electors" in the electoral college—electors who do not do what they have pledged to do under state law. 140 S. Ct. 2316 (2020). Plaintiff counters that state enforcement would violate the Constitution's Qualifications Clause, Doc. 3 at 13-14, but courts have long recognized that a state's *procedural* rules for how a senator is selected do not implicate this

---

his irrevocable pledge to retire on January 3, 2023, and thus withdrawn or revoked said pledge." Doc. 18 at 2.  This is nonsense. Senator Inhofe *hasn't* withdrawn or revoked his pledge, and a written irrevocable pledge cannot be impliedly revoked by an out-of-context quote from a third-party TV ad. More importantly, the verbal statement is obviously reconcilable; Senator Inhofe *is* retiring from the Senate in November, in the sense that his letter started the process by which his replacement will be selected in November, after which Inhofe will enter his "lame duck" period. And Plaintiff's purported confusion as to whether Senator Inhofe perhaps meant November 2023 is inane, given that the statement comes in an ad supporting a specific candidate for the November 2022 election. Doc. 18-1.

clause, *see Storer v. Brown*, 415 U.S. 724, 726 (1974); *Libertarian Party v. Rednour*, 108 F.3d 768, 776-77 (7th Cir. 1997); *De La Fuente v. Merrill*, 214 F.Supp.3d 1241, 1245 (M.D. Ala. 2016). Regardless, Plaintiff's theories prove too much. If followed, they logically lead to the conclusion that *no* resignation is ever effective or enforceable by the State—even a decision to resign immediately. Thus, the State could never call a special election following a resignation.

Even if Plaintiff's absurd scenarios came to pass, the Legislature in its discretion determined that it was nonetheless wise to ensure that not a single day passes where Oklahoma lacks representation in the Senate. Plaintiff may disagree with this policy choice, but this Court's "job is not to assess the wisdom of policy choices." *Biodiversity Legal Found. v. Babbitt*, 146 F.3d 1249, 1257 (10th Cir. 1998). In evaluating Seventeenth Amendment claims, courts "take no position on the balancing of the respective interests" because "[t]hat is a function for which the legislature is uniquely fitted." *Trinsey*, 941 F.2d at 235.

### D.  Under *Purcell,* this Court should not intervene in the 2022 election.

The Supreme Court has instructed federal courts to weigh "considerations specific to election cases," because court orders close to an election "can themselves result in voter confusion and consequent incentive to remain away from the polls." *Purcell v. Gonzalez*, 549 U.S. 1, 5 (2006) (per curiam). The Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *RNC v. DNC*, 140 S. Ct. 1205, 1207 (2020); *see also Merrill v. Milligan*, 142 S. Ct. 879 (2022) (Kavanaugh, J., concurring, joined by Alito, J.) ("federal district courts ordinarily should not enjoin state election laws in the period close to an election"). These warnings have teeth: The Supreme Court "has often stayed lower federal court injunctions that contravened that principle."

*Merrill*, 142 S. Ct. at 880 (Kavanaugh J., concurring, joined by Alito, J.).

Indeed, the Supreme Court has already deployed the *Purcell* principle in the present election cycle. In *Merrill*, on February 7, 2022, a 5-4 Supreme Court majority stayed a district court injunction that was issued seven weeks prior to the beginning of absentee voting in Alabama's primary elections. *Id.* at 879 (Kavanaugh J., concurring, joined by Alito, J.); *see also Veasey v. Abbott*, 830 F.3d 216, 243 (5th Cir. 2016) (under *Purcell*, July is too close to a November election to strike down an entire suite of election laws); *Husted v. Ohio State Conference of N.A.A.C.P.*, 573 U.S. 988 (2014) (staying lower court injunction that changed election laws 61 days before election day). Concurring, and providing the decisive fifth vote, Justice Kavanaugh observed that "state and local election officials need substantial time to plan for elections," since running statewide elections is "extraordinarily complicated and difficult" with "enormous advance preparations" and "significant logistical challenges." *Merrill*, 142 S. Ct. at 880. "Late judicial tinkering with election laws," the justice wrote, "can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters." *Id.* at 881. As such, Justice Kavanaugh posited that a late-coming injunction in an election case should only be issued if the "merits are entirely clearcut" and the "changes in question are at least feasible before the election without significant cost, confusion, or hardship." *Id.*

Here, neither factor is met. If the merits are clearcut, they are clearcut in favor of Defendants. The most that can be said for Plaintiff's position is that his challenge raises a relatively novel question about what a "vacancy" means under the Seventeenth Amendment. Plaintiff certainly hasn't put forward a "clearcut" argument for upending Oklahoma's entire 2022 election. And make no mistake, ruling for Plaintiff at this juncture would do just that. As

Defendant Ziriax testifies, the Oklahoma election cycle has already begun, with hundreds of candidates filing to run, and election officials will momentarily begin designing, proofing, testing, and sending ballot files to the printer. *See* Undisputed Fact Nos. 6-8. At this point, "even heroic efforts likely would not be enough to avoid chaos and confusion" should an injunction issue. *Merrill*, 142 S. Ct. at 880 (Kavanaugh, J., concurring, joined by Alito, J.).

As Defendant Ziriax points out, the filing period has passed, and Oklahoma law does not provide for any subsequent filing. So if the special election is enjoined then 16 candidates would be stuck without a race—including incumbents to other seats. Ex. 6, Ziriax Aff. at ¶ 9; *cf. Merrill*, 142 S. Ct. at 880 (Kavanaugh, J., concurring, joined by Alito, J.) ("Filing deadlines need to be met, but [with the injunction] candidates cannot be sure what district they need to file for."). Moreover, absentee ballots must be sent to overseas and military voters by May 14, *id.* at ¶ 10, a date far closer than the seven weeks in *Merrill*. As a result of the legal and practical realities, Ziriax does not believe the 2022 primary can be conducted without including the special Senate election on the ballot. *Id.* at ¶ 11. And according the FEC's data, candidates for Senator Inhofe's seat have already raised over $4.3 million and spent over $1.1 million on the race. Undisputed Fact No. 10. Upending the race injures all of these donors, as well.

By first bringing a faulty suit in the Oklahoma Supreme Court, then (after losing) waiting over a week to bring this suit, and then forgoing the filing of any motion for expedited relief in this Court, Plaintiff failed to even try seeking relief consistent with *Purcell*. This Court should reject Plaintiff's invitation to upend Oklahoma's electoral process at the last minute.

## CONCLUSION

For the foregoing reasons, this Court should deny summary judgment to Plaintiff.

Respectfully Submitted,

 s/ *Zach West*
_____

MITHUN MANSINGHANI
   *Solicitor General*
ZACH WEST
   *Deputy Solicitor General*
THOMAS SCHNEIDER
   *Deputy General Counsel*

OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone:  (405) 521-3921
zach.west@oag.ok.gov

*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

This certifies that on this 25th day of April, 2022 a true and correct copy of the foregoing

RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT was mailed, postage prepaid to

the following:

Stephen Jones
STEPHEN JONES & ASSOCIATES
214-A North Independence
Post Office Box 472
Enid, Oklahoma 73702-0472


s/ *Zach West*
_____
ZACH WEST
  *Deputy Solicitor General*