IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| STEPHEN JONES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) NO. CIV-22-0278-HE |
| | ) |
| J. KEVIN STITT, *et al.*, | ) |
| | ) |
| Defendants. | ) |

**ORDER**

Under Oklahoma law, vacancies in most state offices are filled by appointment of the Governor. A vacancy in the office of a U.S. Senator from Oklahoma is similarly filled by appointment of the Governor and/or the calling of a special election, depending on the time frame relative to the next general election. Since 2002, Oklahoma law has also provided that, as to any elective office which is filled by special election, the special election process may, subject to certain timing limitations, be triggered by the incumbent office holder filing an "irrevocable letter of resignation" stating his or her intent to resign in the future on a date certain. 26 Okla. Stat. §§ 12-101(C) and 12-119.

Oklahoma's U.S. Senator James Inhofe has invoked that procedure. Senator Inhofe was elected to his most recent term in the U.S. Senate in the 2020 general election and his term would ordinarily end in January of 2027. On February 25, 2022, however, he submitted to the Oklahoma Secretary of State a letter referencing the statutory process and indicating his "irrevocable pledge" to retire at the end of the 117th Congress. His letter indicates his expectation that the timing of his resignation would permit his seat to be filled

by a special election to be held concurrently with the regular election schedule.  In response to the letter, Governor Kevin Stitt issued a proclamation ordering that a special election be held.  The proclamation established deadlines for candidate filing, primary and runoff elections, and a special general election to be held on November 8, 2022.  That process is now underway.

Plaintiff Stephen Jones, an Oklahoma attorney and former U.S. Senate candidate, has challenged that legality of the Oklahoma procedure for filling what he sees as a prospective, rather than actual, vacancy in Oklahoma's Senate representation.  He contends that, under the Seventeenth Amendment to the U.S. Constitution, the special election procedure contemplated by that Amendment may be invoked only after the incumbent senator has actually vacated the office and that the Oklahoma procedure, which contemplates a prospective vacancy based on a stated intent to resign in the future, is inconsistent with the Amendment and therefore unconstitutional.

Initially, Mr. Jones challenged the process by a filing with the Oklahoma Supreme Court, but that court declined to assume original jurisdiction.  He then filed this suit and seeks a declaration that the special election process now underway pursuant to state law is premature and contrary to the Seventeenth Amendment.  He also seeks an injunction blocking the election process now underway.  His contention is that the special election process can properly occur only after Senator Inhofe actually vacates his office in January of 2023 and that, between the time of the senator actually vacates the office and the completion of the special election procedure, a senator would need to be appointed by the Governor.

Defendants are Governor Stitt and the Secretary of the Oklahoma State Election Board. They have moved for summary judgment on the basis that plaintiff Jones lacks standing to challenge the Oklahoma procedure and that the procedure is, in any event, constitutional. The motion is now fully briefed and at issue. An *amicus* brief has also been filed on behalf of the Oklahoma Senate and the Oklahoma House of Representatives which generally supports the constitutionality of the Oklahoma procedure challenged here.

## Discussion

The standard for resolving matters on summary judgment is familiar and will not be belabored here, beyond noting that Fed.R.Civ.P. 56 permits a court to enter judgment as a matter of law where there is no genuine dispute of material fact and party is entitled to judgment as a matter of law. Here, except as otherwise indicated, the material facts are not in dispute and all parties concede the constitutional issues raised by plaintiff's suit are ripe for resolution as a matter of law. However, the threshold consideration is whether this court has the jurisdiction to resolve the case at all and that issue must be considered first.

**A. Jurisdiction — Plaintiff's Standing.**

Article III of the U.S. Constitution limits the federal judicial power to the resolution of "cases and controversies." Hein v. Freedom from Religion Found., Inc., 551 U.S. 587, 597-8 (2007). Here, the parties have given relatively little attention to the issue of Article III standing,[1] but the court is obliged to consider it nonetheless, as it goes to the court's

---

[1] *Defendants' response principally focuses on standing as a matter of § 1983 policy or of the merits-based existence of a valid claim. The Article III inquiry is more fundamental.*

jurisdiction to decide the controversy at all. The party invoking federal jurisdiction has the burden of establishing standing. At the summary judgment stage, the party must set forth, by affidavits or other evidence, facts sufficient to show standing. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).

Article III standing requires a showing by the plaintiff that the challenged action of the defendant(s) caused an "injury in fact" that is likely to be redressed by a favorable decision. Id. at 559-62. The alleged injury must be "concrete and particularized" and either actual or imminent. Massachusetts v. EPA, 549 U.S. 497, 517 (2007). Standing must be based on more than speculation as to a potential future injury. Clapper v. Amnesty Intern. USA, 568 U.S. 398, 409-411 (2013). Applying these standards to the present circumstances, the court concludes plaintiff has not shown a sufficient basis for Article III standing.

Plaintiff essentially contends that the injury in fact to him is that, in light of Oklahoma's procedure, his right to vote and to be considered for temporary appointment to the Senate, as contemplated by the Seventeenth Amendment, is being denied. Insofar as plaintiff relies on a right to vote for Senator Inhofe's successor, there is no apparent injury of any sort. Plaintiff, like all other registered Oklahoma voters, will have the opportunity to vote in the special election now underway and the court can discern no meaningful difference between voting in 2022 or voting in 2024, if the process is otherwise valid. The situation here is unlike that in Judge v. Quinn, 612 F.3d 537 (7th Cir. 2010), upon which plaintiff relies and where the court found the plaintiffs to have standing. There, plaintiffs were voters who wanted to vote on the successor to Senator, later President,

4

Obama. The Governor of Illinois had declined to issue a writ of election, apparently intending to have the temporary appointee serve out the balance of the Senate term. Against that backdrop, and in light of the Seventeenth Amendment's general principle that senators be elected by the people, the Seventh Circuit concluded the plaintiffs, as voters, had a sufficient interest in asserting their right to vote to confer standing. 612 F.3d at 545-6. Here, by contrast, plaintiff's right to vote is not denied by the Oklahoma procedure. Indeed, it affords him the opportunity to vote sooner than he otherwise would have. The result is that the Oklahoma procedure does not operate to impair his right to vote in a fashion sufficient to confer standing on that basis.

To the extent that plaintiff grounds his claim to standing on his status as a potential appointee, the analysis is somewhat different. If, as plaintiff contends, a vacancy has not yet occurred based on Senator Inhofe's continuance in office and will occur only when he vacates it following the current legislative session, then Oklahoma law would presumably require that the special election for the remaining balance of the term occur at the next regularly scheduled series of election. 26 Okla. Stat. §12-101(C)(2) (i.e., a "vacancy" occurring after March 1 of the even numbered year). That would be in the 2024 election cycle. Further, the Governor would appoint a temporary replacement in the meantime. 51 Okla. Stat. §10(C)(1).[2]

---

[2] *The Oklahoma procedure appears designed to assure that temporary appointees by the Governor, including an appointed U.S. Senator, will never be anything other than a short-term, temporary office holder. See 51 Okla. Stat. § 10(D) (prospective appointee must file a statement under oath affirming that he/she will not be a candidate for the office when it next appears on the ballot.)*

Plaintiff indicates he has expressed his interest in serving as a replacement senator to Governor Stitt by letter and desires to be considered for the temporary appointment pending the special election.  Defendants challenge whether plaintiff is serious about his claimed interest in the position or whether he is just claiming that to manufacture standing, but the court has little doubt that plaintiff is serious given his background and long-term interest in politics and government.  He is a prominent lawyer of many years' experience, has represented multiple state and federal officials in various contexts, is a former Congressional staffer, has written extensively about elections, government officials and candidates, and is himself a former Republican nominee for the U.S. Senate.  His interest in serving is clear enough.

What is not clear is whether Governor Stitt is likely to appoint plaintiff to the U.S. Senate if the opportunity presents itself.  There is no formal procedure under Oklahoma law for applying for appointment to a U.S. Senate seat, so plaintiff's letter expressing interest has no formal significance that might differentiate him from thousands of other registered Oklahoma voters who might also be eligible for appointment.  Further, plaintiff has offered no evidence suggesting that Governor Stitt is inclined, tentatively or otherwise, to appoint him to any vacancy.  The most that can be said on this record is that the Governor <u>might</u> appoint him, but with no real assurance that result is any more likely than would be the possible appointment of many, many others.  Such a speculative calculation is inconsistent with the necessary basis for standing, that the threatened injury be "certainly impending."  *See* <u>Summers v. Earth Island Institute</u>, 555 U.S. 488, 496 (2009); <u>Whitmore v. Arkansas</u>, 495 U.S. 149, 157-160 (1990).  As the Supreme Court noted in <u>Clapper</u>, 568

U.S. at 414, it has traditionally been reluctant to "endorse standing theories that rest on speculation about the decisions of independent actors." Here, the Governor is plainly such an "independent actor" and, on this record, there is no non-speculative basis for concluding he would, or likely would, appoint plaintiff to the Senate if the opportunity presented itself. As a consequence, plaintiff has not shown standing based on his interest in being appointed by the Governor as a temporary U.S. Senator.

The result is that plaintiff has not shown a basis for standing to raise the claims he asserts here, based either on his status as a voter or on his status as a prospective appointee to any short-term vacancy.

In concluding that plaintiff lacks standing to pursue the relief he seeks here, the court is mindful of the concern that application of the standing requirement in this fashion might translate into precluding any meaningful test of the constitutionality of the Oklahoma procedure. If plaintiff cannot raise the issue, then who can? But that really is not the question. The assumption that no one else has a better basis for standing than plaintiff does not translate into standing for plaintiff. Clapper, 568 U.S. at 420-1 (citing multiple cases). And, in any event, the court's conclusion here as to plaintiff's lack of standing does not necessarily preclude a challenge to Oklahoma's statutory scheme in other circumstances. A governor might, for example, call a special election on the assumption the law required him or her to do so, while at the same time having and expressing a preference for appointing someone on a temporary basis. The Governor or that particular "someone" might well have standing to challenge the Oklahoma scheme. Moreover, as plaintiff has noted in other contexts, the U.S. Senate is the sole judge of the elections and qualifications

7

of its members. U.S. Const. Art. I, Sec. 5; Burton v. United States, 202 U.S. 344 (1906). Presumably, it could evaluate for itself whether the Oklahoma procedure is valid under constitutional standards.

In any event, the court concludes plaintiff lacks standing to raise the claims he has asserted here. As a result, the court lacks jurisdiction to consider them. This case must therefore be dismissed for lack of jurisdiction.

B. **Merits — Constitutional Claim.**

Having concluded that the court lacks jurisdiction, the court would ordinarily dismiss the case and leave it at that. Indeed, if the jurisdictional conclusion is correct, anything further the court might say now as to the merits of plaintiff's claims is essentially surplusage. However, the court is mindful of the fact that its decision may well not be the final word on the standing issue and that appellate review is possible and perhaps likely. Concepts of standing are difficult of application, and it is possible that the Court of Appeals may see the issue differently. If it does so, then the substantive merit of plaintiff's claims would have to be resolved. In the particular circumstances of this case, there are substantial reasons why any such merits resolution should occur as quickly as possible. The special election process is underway. Multiple candidates are expending millions of dollars campaigning. By November, a winner will be declared and a senator deemed elected. Given the substantial public interest in a prompt resolution of the entire controversy, and as the pertinent merits issues are already fully briefed, the court concludes it is appropriate to state its further conclusions as to the merits of plaintiff's claims.

Plaintiff's contention is that the Oklahoma statutory procedure, which authorizes a special election based on a prospective "vacancy" in the U.S. Senate triggered by the incumbent senator filing an "irrevocable resignation in writing," is contrary to the terms of the Seventeenth Amendment and hence unconstitutional. Specifically, plaintiff contends that the office of senator must be unoccupied, without an incumbent, in order for there to be a vacancy within the meaning of the Amendment. He further contends that in order for a state to commence the special election process before the office is completely unoccupied, there must be an express delegation of authority in the Constitution for the state to do so. He contends no such delegation exists.

As to the threshold question of whether the authority of a state to regulate vacancy elections like this one must be delegated, plaintiff is correct. Where elections for federal office are concerned, the authority of the states to conduct and regulate them is based on authority granted by the U. S. Constitution, rather than on inherent or retained powers of the states. U.S. Term Limits Inc. v. Thornton, 514 U. S. 779 (1995). But as to the further question of whether sufficient authority has been delegated to the states to permit the procedure Oklahoma has adopted, the court concludes that it has.

The parties acknowledge that this case is one of first impression. There is apparently no case which has addressed the constitutionality under the Seventeenth Amendment of a statutory special election procedure like that employed by Oklahoma, which permits the vacancy-filling process to be triggered by the filing of an "irrevocable letter of resignation." 26 Okla. Stat. § 12-119. As the Ninth Circuit Court of Appeals has observed, the "meaning of the Seventeenth Amendment has seldom been litigated, and no body of doctrine provides

9

us with robust guidance as to its proper interpretation." Tedards v. Ducey, 951 F.3d 1041 (9th Cir. 2020).  Of the cases which have addressed the Amendment, most appear to have been challenges to state procedures which permitted increased reliance on gubernatorial appointments to fill Senate vacancies rather than on special elections.  *See e.g.,* Tedards, supra (challenging 27-month interim appointment duration); Judge, supra (challenging interim appointment of up to four years); Valenti v. Rockefeller, 292 F.Supp. 851 (W.D.N.Y. 1968), sum. aff'd. 89 S.Ct. 689 (1969) (challenging delay of 29 months before special election held).  They generally did not involve any dispute as to whether a vacancy within the contemplation of the Amendment had occurred.  *See e.g.,* Judge, 612 F.3d at 547.

The starting place is, of course, the language of the Seventeenth Amendment itself. The Amendment provides, in pertinent part:

> The Senate of the United States shall be composed of two Senators from each State, elected by the people thereof, for six years; and each Senator shall have one vote. . . .
>
> When vacancies happen in the representation of any State in the Senate, the executive authority of such State shall issue writs of election to fill such vacancies: *Provided,* That the legislature of any State may empower the executive thereof to make temporary appointments until the people fill the vacancies by election as the legislature may direct.
>
> …

The amendment provides no explicit guidance as to when "vacancies happen." Tedards, 951 F.3d at 1050.  Plaintiff contends the term must be understood as it would have been understood by persons at the time of adoption and cites various dictionary and similar

definitions of "vacancy" supporting the idea that, to be "vacant," an office must be unoccupied.  The argument is a respectable one, but the court concludes it takes too narrow a view of the constitutional language and fails to take into account other constitutional principles which impact the result here.

The Seventeenth Amendment itself provides that the states shall have a measure of control and discretion over vacancy elections, particularly the provision that temporary appointments may be made "until the people fill the vacancies by election as the legislature may direct."  Although the appellate cases applying that phrase take somewhat differing views as to whether it qualifies only the proviso as to appointment power or the Amendment more broadly, they all appear to recognize the legislature's discretion as to directing vacancy elections.  See Tedards v. Ducey, 951 F.3d 1041, 1051 (9th Cir. 2020) (confers discretion as to the "direct[ing]" of a vacancy "election"); Judge v. Quinn, 612 F.3d 537, 550 (7th Cir. 2010) ("the proviso gives the state legislatures the power to direct the "election" in which the people "fill the vacanc[y]"); Trinsey v. Com. of Pa., 941 F.2d 224, 232-3 (3d Cir. 1991); Valenti v. Rockefeller, 292 F.Supp 851, 866 (W.D.N.Y. 1968), aff'd. 393 U.S. 404 (1969).  As the Valenti court put it, "We read the Amendment to confer a reasonable discretion upon the states concerning the timing and manner of conducting vacancy elections."  Id.³

But the Seventeenth Amendment is not the only applicable source of constitutional authority delegated to state legislatures.  As the Judge court noted:

---

³ *The Supreme Court's affirmance of Valenti was summary in nature and therefore has limited precedential force.  Tedards, 951 F.3d at 1061-2.*

11

> [T]he power of state legislatures to regulate elections to fill vacancies in the Senate is not established by the second paragraph of the Seventeenth Amendment alone. To the contrary, the Elections Clause in Article I, Section 4 of the Constitution instructs the states to prescribe "[t]he Times, Places and Manner of holding Elections for Senators and Representatives," subject to Congress' power to override those regulations.

Judge, 612 F.3d at 550. And under Art. I, Section 4 (the "Elections Clause"), the states have "'broad power' to prescribe the procedural mechanisms for holding congressional elections." Cook v. Gralike, 531 U.S. 510, 523 (2001). Thus, the Elections Clause provides additional authorization for states to address the timing and manner of vacancy elections.

The court concludes the "reasonable discretion" and "broad power" conferred on the states by the Seventeenth Amendment and the Elections Clause are sufficient to authorize the procedure that Oklahoma has adopted, and that the Seventeenth Amendment does not mandate a particular and different sequence of events. In effect, the Oklahoma procedure commences the election procedure before the office becomes unoccupied but nonetheless fills the "vacancy" through its control of the "time" and "manner" of the election.

In reaching that conclusion, the court notes that the Oklahoma procedure is fully consistent with the principal purpose for the Seventeenth Amendment's adoption — the direct election by the people of the members of the Senate — and it is not inconsistent with the related purpose of assuring that each state is represented in the Senate by two members at all times. Compared to many other state schemes for filling Senate vacancies, the

Oklahoma scheme maximizes the circumstances under which Oklahoma's members are popularly elected. Further, while the parties have not devoted substantial attention to the "legislative history" of the Seventeenth Amendment or the Elections Clause apart from the discussions in the various cases, the court does not see that history as necessarily inconsistent with the Oklahoma procedure.

The court has also considered the parties' arguments as to more recent history in Oklahoma. Defendants note that the Oklahoma procedure for filling Senate vacancies has been employed previously without objection, including when Senator Inhofe himself was elected in 1994 (upon the prospective resignation of then-Senator Boren) and more recently when Senator James Lankford was elected (upon the prospective resignation of then-Senator Coburn). As plaintiff correctly notes, a history of particular state practices having occurred does not, in and of itself, translate into a conclusion that those practices were constitutional. *See* Term Limits Inc., 514 at 823 (noting that a state's own practices are not a reliable indicator of the Constitution's restrictions on state authority). However, the history does have some pertinence here for a different but related reason. As noted above, the Senate is the judge of the elections and qualifications of its members. U.S. Constitution, Art. I, Sec. 5. So far as the court has been able to determine, no issue was raised by any senator as to the propriety of seating Senator Inhofe and Senator Lankford after they were selected pursuant to some version of the current Oklahoma procedure.[4] While the absence of objection in 1994 or 2015 does not tend to show the intent of the framers in adopting

---

[4] *The parties' summary judgment submissions do not directly address that issue, but the court's recollection and research suggest no objection was made.*

either the Elections Clause or the Seventeenth Amendment many years before, it does at least suggest that Oklahoma's approach is not so arbitrary or unreasonable as to be outside the "reasonable discretion" of the legislature as referenced in the authorities noted above.

Finally, the court has considered plaintiff's other arguments as to why the Oklahoma procedure cannot be constitutional. He argues permitting the special election process to begin prior to Senator Inhofe actually vacating the office, based on the "irrevocable letter of resignation," could permit him to change his mind.[5] He argues that senators in such situations might use the procedure (coupled with the Senate's power to determine the qualifications of its own members) to, in effect, pick their successor — revoking their resignation if they disliked the successor, the successor's party affiliation, or the like. Defendants suggest those are "outlandish hypotheticals," noting that Senator Inhofe is 87 years old and unlikely to reverse course, but defendants' response misses the point. It may well be unlikely that Senator Inhofe would reverse course in the circumstances existing here and there is certainly nothing in the record to suggest manipulation of the process by him.[6] But the present challenge to the constitutionality of the Oklahoma statutory scheme is to the scheme generally, not merely to its application to the Inhofe seat. Viewed in that light, and against the backdrop of the intense partisanship and high stakes of Senate elections, the hypotheticals suggested by plaintiff strike the court as not being "outlandish"

---

[5] *Given the Senate's power to determine the qualifications of its members, it may well be that there is no other authority which might limit a senator's ability to revoke an "irrevocable" resignation.*

[6] *His resignation letter expressed a preference for a particular successor, but there is no indication he would seek to thwart whatever decision is made by the voters of Oklahoma.*

at all.  Further, there are other circumstances one can envision where a senator might change his or her mind after having invoked the Oklahoma resignation procedure.  If that occurred, the result could very well be that a hard fought and expensive special election conducted in the meantime would turn out to be a nullity, with collateral consequences for others.[7]  Such a "changed mind" result would, in any circumstance the court can readily envision, be an abuse of the vacancy-filling process employed by Oklahoma.  But the possibility that the statutory process might be abused in certain circumstances does not make it unconstitutional.

For these reasons, the court concludes the challenged Oklahoma procedure for filling Senate vacancies is within the reasonable discretion of the State to regulate the time, place, and manner of elections as granted by the Seventeenth Amendment and the Elections Clause.  The U.S. Congress could preempt the Oklahoma scheme as to Senate vacancy elections if it chose to, but it has not.  See Fish v. Kobach, 840 F.3d 710, 725-26 (10th Cir. 2016).

### C.  Merits — State Law Issues

Plaintiff has also advanced arguments that the current special election is contrary to Oklahoma state law in various respects.  Plaintiff purports to bring the present suit base on 42 U.S.C. § 1983, which is the statutory authorization for claims challenging the violation of rights arising under federal, rather than state, law.  The court's supplemental jurisdiction

---

[7] *The amicus brief of the Oklahoma House and Senate notes that one Oklahoma member of the U. S. House of Representatives elected to run for the U.S. Senate in the current special election rather than seeking re-election to his House seat.*

potentially extends to such state law claims. 28 U.S.C. § 1367. However, the court concludes, in light of its conclusion that the court lacks federal jurisdiction in the first place, the necessarily contingent nature of any further decision addressed here, and the various additional considerations impacting any decision to exercise supplemental jurisdiction, that it is unnecessary to address now any claims or arguments based on Oklahoma state law.

## Conclusion

The result is that, on the present record, no basis has been shown for declaring the Oklahoma procedure to be unconstitutional or for enjoining the election now underway. Even if plaintiff is assumed to have standing to assert the claims he has pursued here, the court would conclude summary judgment should be entered in defendants' favor as to any claims arising under the U. S. Constitution.

As plaintiff lacks standing to press the claims asserted here, the court lacks jurisdiction to decide them. The case is therefore **DISMISSED** without prejudice.

**IT IS SO ORDERED**.

Dated this 1st day of June, 2022.

_____
JOE HEATON
UNITED STATES DISTRICT JUDGE